## Case No. 15,447.

UNITED STATES v. The ISLA DE CUBA.

[2 Cliff. 295.] [1]

Circuit Court, D. Massachusetts.    May Term, 1864.[2]

CIRCUMSTANTIAL EVIDENCE—LIBEL OF FORFEITURE —VESSEL ENGAGING IN SLAVE TRADE— DECLARATIONS OF MASTER.

1. Whenever the necessity arises for a resort to circumstantial evidence, either from the nature of the inquiry or the failure of direct proof, objections to testimony upon the ground that any particular circumstance is irrelevant or of an inconclusive nature and tendency, are not favored, for the reason that the force and effect of circumstantial facts usually, and almost necessarily, depend upon their connection with each other or with the direct proofs in the case.

2. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.

3. Separate examination of circumstantial facts is indispensable in order to ascertain whether the facts themselves are fully proved, but the final determination of the issue or matter in controversy, cannot safely be placed entirely upon that examination.

4. In this case, which was a libel of information against a vessel for engaging in the slave-trade, the truth or falsity of the charge depends, not only upon a view of the circumstances attending the fitting, equipping, and loading of the vessel, but also of the circumstances of the voyage, and both of these must be weighed in connection with the declarations of the master, which are clearly admissible, and are by law to be regarded as direct evidence in cases of this description.

5. Declarations of the master of a vessel engaged in an illegal traffic, as to his suspicions that the purpose of the voyage was not legal, are not mere opinions, but rather admissions; and where he occupies to the vessel the double relation of owner and master, are clearly admissible in evidence.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a libel of information filed in the court below against the bark Isla De Cuba, her tackle, apparel, and furniture, as well as her cargo, claiming a forfeiture of the whole, for an alleged violation of the laws of the United States prohibiting the slave-trade. 1 Stat. 347; 3 Stat. 450. The libel was filed in the district court on the 18th of October, 1858. It was charged that on the 1st of September previous, certain persons at the port of New York fitted out and equipped the bark, and otherwise prepared her for the purpose of procuring certain negroes or persons of color from a foreign country to be transported to a certain place, unknown, then and there to be held and sold as slaves; and that the said persons caused the bark so fitted out to sail from the port of New York, with the intent to employ the vessel for the purpose aforesaid, and in the aforesaid slave-trade. Monition was duly issued, and on the 10th of November, 1858, George M. Rea appeared and filed a

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

2 [Affirming Case No. 15,449.]

claim to the vessel, her tackle, apparel, and furniture, by virtue of a mortgage executed to him by G. J. De La Figaniere, to secure originally, the sum of $8,000, and that there was still due, together with interest, the sum of $6,571.40. The attorney of J. S. Correa also filed a claim for the cargo of the vessel, stating therein that his principal was the true and bona fide owner of the same, and prayed that a decree of restitution might be entered in his favor. The vessel and cargo were both sold in the court below, and the proceeds paid into the registry. The district court sustained the libel, and entered a decree of condemnation and forfeiture, both against vessel and cargo [Case No. 15,449]; whereupon the claimants appealed to this court.

C. L. Woodbury, for the United States, cited The Merino, 9 Wheat. [22 U. S.] 398; The Malek Addel, 2 How. [43 U. S.] 233; The St. Jago De Cuba, 9 Wheat. [22 U. S.] 411; The Venus, 8 Cranch [12 U. S.] 253; Ten Hogsheads of Rum [Case No. 13,830]; The Estrella, 4 Wheat. [17 U. S.] 306; The Robert Edwards, 6 Wheat. [19 U. S.] 190. In cases in rem, where forfeiture is claimed for an offence committed, the courts of the United States hold that claimants should be strictly held to rebut conclusively all the prima facie case made out. The Josefa Segunda, 5 Wheat. [18 U. S.] 354; U. S. v. The Catherine [Case No. 14,755]; Taylor v. U. S., 3 How. [44 U. S.] 197. When the burden is thus changed, the defence must be brought clear of any reasonable doubt. The Short Staple [Case No. 12,-813]; Ten Hogsheads of Rum [supra]. See, also, Marcy v. Marcy, 6 Metc. [Mass.] 360; American Fur Co. v. U. S., 2 Pet. [27 U. S.] 363; U. S. v. Gooding, 12 Wheat [25 U. S.] 468.

Sohier & Welch and Charles N. Black, for appellants.

The United States must make out the charge beyond a reasonable doubt. The Emily & Caroline, 9 Wheat [22 U. S.] 381. So far as the fitting of the vessel is concerned, it must be shown to be inconsistent with any hypothesis of innocence. See The Catherine [supra]. As to the master's declarations, see U. S. v. Gooding, 12 Wheat. [25 U. S.] 460; 1 Greenl. Ev. 114. Transportation of any kind of goods to Africa is not a crime independent of the intent with which it is done. U. S. v. Libby [Case No. 15,597]. See Locke v. U. S., 7 Cranch [11 U. S.] 339.

CLIFFORD, Circuit Justice. The present register shows that the Isla De Cuba was built in New York in the year 1849, but the record of the case does not show who was the builder or the original owner. The claimants' proofs show that one G. J. De La Figaniere, purporting to act as sole owner, on the 10th of November, 1857, mortgaged the vessel to one George M. Rea, to secure the sum of $8,000, and they offer proofs tending to show

that the sum mentioned in the claim for the vessel yet remains due and unpaid.

The libellants' proofs, however, show that one Jonathan Dobson. on the 6th of August, 1858, chartered the vessel to J. S. Correa for a voyage from the port of New York to the west coast of Africa and back, and that on the following day he took out a register in his own name, in which he made oath that he was the only owner of the vessel. He was also the master, and the oath signed by him in that capacity, and the manifest which he presented to the collector, represent the intended voyage as one from the port of New York to Loango, which is on the west coast of Africa. The theory of the claimants is that J. S. Correa freighted the vessel, and the proofs show that the business was transacted in his name

The vessel sailed from the port of New York on the 10th of August, 1858, with three passengers and a supercargo on board, in addition to the master and crew. The United States charge that she was fitted out and sailed from the port of departure to engage in the slave-trade, and they insist that the proofs fully establish the fact that such was the intent of her fitment, equipment, and voyage. The counsel of the claimants deny the entire proposition, and insist that the decree of the district court was erroneous and should be reversed. The owner of the vessel presents no claim, and the proofs afford no explanation of the fact which is consistent with the theory of the claimants. The charter-party represents the voyage as one from the port of New York to port or ports on the west coast of Africa between Cape De Verde on the north, and Cape Lopez on the south, and yet the bill of lading and the manifest extend the limits on the coast, to a point five degrees farther south, which of itself is a circumstance of suspicion. The ownership of the cargo and the existence of the mortgage as a subsisting lien upon the vessel, are not satisfactorily established, and the failure to advance further proofs upon those topics is well calculated to create distrust as to the bona fides of the respective claims; but it is not necessary to place the decision of the cause upon any of those grounds, because I am of the opinion that the fitment of the vessel. the circumstances of the voyage, and the declarations and conduct of the master and those on board, afford the most conclusive evidence that every charge in the libel is true, beyond every reasonable doubt. A statement of conclusions is perhaps sufficient and all that is desirable to the parties; but in view of the whole case. it seems expedient to enter briefly into the details of the evidence, although the question is purely one of fact. A suspicion arises from the manner in which the cargo was stowed. The evidence shows that the ground tier of casks was carefully arranged according to sizes. so as to present on the top a uniform surface like a deck; and there were four tiers of boards, consti-tuting a platform, placed on the barrels, two fore and aft, and two athwart ship, which had the effect to convert the whole length and breadth of the hold of the ship into a substantial deck, where negroes might conveniently be carried on the voyage. The documents show that the casks under that platform contained about twenty-two thousand gallons of fresh water, and the mate testified that the master informed him that ninety of the casks containing the water, were cleared as oil casks. The platform of boards was cut through in one place, as if to form a hatchway to get at the casks containing the water. The cargo on the return of the vessel was found to contain more than seventy barrels of rice, although it appears that twelve barrels had been sold at Fayal, in the course of the voyage. When the vessel sailed she had on board only a small quantity of beans shipped by the passengers, but an additional quantity of ten or eleven sacks was purchased at Saint Michael's, and taken on board at that port, where the vessel stopped for a short time. The vessel also had on board fifty boxes of herring, and fifty boxes of codfish, and most or all kinds of provisions usually found in a vessel engaged in a slave voyage. Four large boilers were also found on board in boxes, with all the necessary apparatus for cooking, and the cargo also included some ten dozen pails or buckets, and seventeen crates of crockery, embracing every variety which would be necessary and convenient, in supplying and serving the negroes with food and water. Muskets, swords, and cutlasses were also found on board, packed in boxes and stowed as cargo, and another box containing a considerable quantity of iron rods fitted for grating, and such as might conveniently be used to surround the main hatch, was also found on board. None of these boxes are on the manifest, nor does it appear by what means or under what pretence, they were shipped and stowed as cargo. The owners, shippers, or consignors of the cargo on board a vessel bound to a foreign place. are required by law, before a clearance shall be granted, to deliver to the collector manifests of the cargo, and verify the same by oath or affirmation. The requirement is also, that such manifests shall specify the kinds and quantities of the articles, and the value of the total quantity of each kind. The oath or affirmation required is, that such manifest contains a full, just, and true account of all articles laden on board such vessel. and that the values of the articles are truly stated, according to their actual cost at the port and time of exportation. 3 Stat. 542. The circumstances indicate that the boxes. as well as other articles hereafter to be mentioned. were shipped and cleared through fraud and perjury. The freight was taken on board at different places, the vessel moving from one wharf to another for that purpose as many as three or four times, which, of course, afforded unusual fa-

cilities for shipping articles of a suspicious character, without attracting the attention of the revenue officers or the public. Four boxes of medicines, in addition to the usual medicine-chest for the ship's company, were also found on board, containing all or nearly all the ingredients usually found in vessels fitted out for the slave-trade and engaged in that traffic. The medicine-chest was well supplied, and no satisfactory explanation is given why this large additional quantity was shipped, nor of the fact that none of the boxes are placed on the manifest. Two principal suggestions are put forth as explanations to obviate or rebut the inference drawn by the United States, from the shipment of the various articles mentioned, and the circumstances under which the shipment was made. All these articles, it is said in the first place, are sometimes if not frequently found in vessels engaged in lawful trade along that coast; and secondly, that the facts themselves as proved are of an inconclusive nature and tendency, and really ought to be considered as irrelevant. Such articles, it may well be admitted, are not infrequently shipped for lawful commerce in that trade, but it is scarcely to be conceived that such a fitment, without more, was ever made under similar circumstances and coincidences. The bark had a small cargo of merchandise other than the articles already mentioned; but the great weight of the evidence, while it clearly authorizes the theory that as a whole it was suitable for the illegal purpose charged in the libel, also fully warrants the conclusion, that as a lawful commercial adventure to that coast, it was insufficient in quantity, and very unwisely selected, because a considerable portion of the articles was either unsalable, or was in undue proportion to the rest of the cargo. Fresh water is not an article shipped for sale, and the iron rods for grating were much better suited to surround the main hatch, and thus convert the hold of the ship into a close prison, than for any known lawful purpose connected with such a voyage. Boilers and medicines may doubtless be sold in those markets; but if intended for that purpose, some explanation ought to be given why the boxes containing the articles were not placed on the manifest, as it fully appears that they are articles usually selected as cargo for that trade. The first explanation of the claimants, therefore, is not satisfactory; and the second is no better, and in point of fact is entitled to less consideration. Whenever the necessity arises for a resort to circumstantial evidence, either from the nature of the inquiry, or the failure of direct proof, objections to testimony, upon the ground that any particular circumstance is irrelevant or of an inconclusive nature and tendency, are not favored, for the reason that the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other or with the direct proofs in the case. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof. Castle v. Bullard, 23 How. [64 U. S.] 187. The separate examination of circumstantial facts is indispensable, in order to ascertain whether the facts themselves are fully proved; but the final determination of the issue or matter in controversy, cannot safely be placed entirely upon that examination. Whether matters of fact are submitted to courts or jurors, they should be determined upon the whole evidence given; and in this case the truth or falsity of the charge depends, not only upon a view of the circumstances attending the fitting, equipping, and loading of the vessel, but also of the circumstances of the voyage, and both must be weighed in connection with the declarations of the master, which are clearly admissible, and are, by law, to be regarded as direct evidence in cases of this description. U. S. v. Gooding, 12 Wheat. [25 U. S.] 460. The witnesses speak of the number of the passengers as four; and if J. S. Correa, sometimes mentioned as supercargo, be regarded as such, then the witnesses are correct. Three were Portuguese, and one was a Spaniard. The mate testifies that the vessel arrived at Fayal on September 2, 1858; and it was while the vessel was lying there in the stream that the twelve barrels of rice were sold. While there, also, another passenger came on board, Jacob M. Smalley, who is an important witness for the United States. The master and passengers went ashore once or twice. The attention of the mate was called by the master to the fact that the documents of the supposed supercargo showed, that there were twenty-two thousand gallons of fresh water in the hold of the vessel, and he (the mate) was requested to examine and ascertain if such was the fact. Accordingly he made the examination, and found the fact to be as represented, or that some of the casks at least contained fresh water, and he so informed the master. Notwithstanding this discovery, the vessel proceeded on her voyage to the port of Saint Michael's, but the suspicions of the master were greatly aroused as to the character and intent of the voyage. They arrived at Saint Michael's on the 12th of the same month, and while there the passengers from the port of departure, purchased the sacks of beans, which were added to the cargo. Twenty-seven bales of the dry goods were there discharged, and converted into money. A conversation there took place between the master and the mate in regard to the character of the voyage, in which the former told the latter that he suspected that the voyage was an illegal one, and in that view of the matter the latter substantially concurred. Smalley's testimony shows that the passage from Fayal to Saint Michael's was accomplished in twenty-four hours. During that time he had various conversations with the master, which in substance

and effect show that the master felt himself in danger from the four foreigners on board as passengers, and so deep were his convictions, in that behalf, that he cautioned the witness not to drink any of the wine at dinner, unless he, the witness, first saw him, the master, drink from the same vessel, assigning as a reason for his fears, that they had attempted to poison him at Fayal while the vessel lay there, and expressing the opinion that they intended to use poison to accomplish their purpose. Precautions were taken by the master to guard against assassination or violence from that quarter; and to that end the witness states that he, the master, requested the mate to have his axe in readiness for use, and also requested the cabin-boy to sleep with a hatchet under his pillow; and so strongly were his fears aroused as to the danger, that he requested the witness to remain awake while he, the master, slept, and agreed himself to remain awake while the witness slept. The testimony shows that the bark remained at Saint Michael's for the period of ten days, and that while there, he gave up the command to the mate, under the sanction of the American consul, and left the vessel. When he gave up the command, he cautioned the mate to keep all of the papers out of the way of those passengers, assigning as a reason for the caution, that he suspected that the vessel was engaged in an illegal voyage. The statement of the mate is that when the master surrendered the command to him, he gave him an order to sail for New York, as he, the master, considered the voyage illegal. The objection is made that these declarations are not admissible, but it should be remembered that he was not only master of the vessel, but her sole owner. His opinions, it is said, are not admissible, but the declarations of a person occupying the double relation of master of the vessel and sole owner are clearly competent, and it is as declarations or admissions, and not as opinions, that the evidence is in the case, and in that point of view it is admissible. Having surrendered the command, he left the vessel, and the mate became the acting master. Three days afterwards he called these passengers and all hands forward, and told them he was going to take the vessel to the United States, because he considered that the voyage to the coast of Africa was a voyage for slaves. The passengers at once began to cry, and one of them said he thought the late master had told him where the vessel was going, and all about the voyage. The witness told them he did know all about the voyage, and in effect gave them to understand that it was on that account that he was about to return. They begged him to run into Flores, and put them ashore, but he refused, saying that he was quite near enough to land, and that he would not go any nearer. But he offered them a boat of four or five tons, which they accepted. The vessel was then about one hundred and twenty miles from Flores, and they left in the boat, taking one or two bales of goods, two or three barrels of rice, some fish, and other provisions, and five or six trunks which contained their baggage. Before they left, however, J. S. Correa, the present claimant, made a bill of sale to the mate of all the cargo left on board. His claim is that the voyage was a legal one, and that he was the bona fide owner of all the cargo; and yet upon being informed by the mate that he was going to take the vessel to the United States as a slaver, he voluntarily parts with all his property, except the small parcels before mentioned, and in the open sea, when the ship was in no danger, leaves her deck and takes his chances to reach the shore in an open boat of four or five tons. The parties have a right to set up such a defence and urge it upon the consideration of the court, but they can hardly expect the court to adopt any such improbable theory. Nothing need be added respecting the declarations of the master, except to remark, that the testimony is full to the effect that he repeatedly said that the voyage was an illegal one, and was for the purpose of procuring slaves, or words to that effect; and on one occasion he showed his letter of instructions to the witness Smalley, which, if the contents are correctly given, showed to a demonstration that such was the fact.

In view of the whole case, I am of the opinion that the whole charge as laid in the libel is proved beyond any reasonable doubt. The decree of the district court is, therefore, affirmed with costs.

[Subsequently a petition was filed to open a decree of distribution, which was denied in Case No. 15,448.]